STATE OF LOUISIANA
v.
ELMECO M. BURNES
No. 2008-KA-0622.
Court of Appeals of Louisiana, Fourth Circuit.
December 17, 2008.
NOT DESIGNATED FOR PUBLICATION
JOHN F. ROWLEY, District Attorney, WALKER H. DRAKE, Jr., Assistant D.A. Counsel for Plaintiff/Appellee.
JOHN HARVEY CRAFT, Louisiana Appellate Project Counsel for Defendant/Appellant.
Court composed of Judge BAGNERIS, Sr., Judge LOVE, and Judge BELSOME.
DENNIS R. BAGNERIS, Sr., Judge.
On August 25, 2004, a St. Bernard Parish grand jury issued an indictment charging Elmeco M. Burnes ("Burnes") with first degree murder in violation of La. R.S. 14:30. On February 28, 2007, this charge was reduced to Second Degree Murder, a violation of La. R.S. 14:30.1. Thereafter, Burnes moved to be released pursuant to La. C.Cr.P. art. 701 and was denied relief on July 18, 2006. On February 28, 2007, Burnes pled not guilty to the amended charge, moved to suppress evidence and moved to continue trial. The trial court denied both motions, and a jury was selected. After a two day trial, the jury found Burnes guilty of second degree murder.
On August 28, 2007, the trial court heard Burnes' Motion for New Trial and Post Verdict Judgment of Acquittal. The trial court denied both motions and sentenced Burnes to life in prison without the benefit or probation, parole, or suspension of sentence. For the following reasons, we hereby affirm Burnes' conviction and sentence.

FACTS

Testimony of Jamal Peters
Jamal Peters ("Peters") was twenty-three years old when his twenty-four year old brother, Rayford Peters ("Rayford"), was killed in July, 2004. According to Peters, he and his brother saw Burnes washing his car on the day of the shooting as they drove to the store. As they passed, Burnes shouted profanities at them. At that time, Rayford exited the van and approached Burnes to see what the problem was. Rayford got within two or three feet of Burnes and Burnes "iffed" at him. Upon hearing the "fussing" Peters exited the van and approached Rayford and Burnes to see what they were discussing. At some point, Burnes' brother appeared on the scene too. Eventually, Burnes' brother told the Peters brothers to wait while he went to retrieve a weapon. Burnes ran off too. At that point, the Peters brothers fled in their van. Peters denied ever having seen Burnes prior to this incident. Thereafter, the Peters brothers went to pick their mother up from work in New Orleans East.
Thereafter, the Peters brothers were on their lawn on Angelique Drive when Burnes passed in his car, rolled the window down, and pointed an AK-47 at them. They ran behind their van because they thought Burnes was going to open fire, although he did not. Thereafter, the Peters brothers and their friend, Charles Jackson, got two guns for protection and drove the van to Daniel St. to see Burnes in an effort to make peace. The van had two bench seats behind the driver's and the front passenger seats. Rayford drove; Charles Jackson was in the front passenger seat, and Peters was in the front bench seat, behind his brother. Peters denied bringing a firearm. The two guns were placed on the floor between the driver and passenger seats.
The trio in the van found Burnes in his yard. Peters got out of the van and approached Burnes to ask why he had been cursing. The two men spoke and shook hands. Burnes then walked with Peters back to the van. Peters sat in the van, and the conversation continued. The men shook hands again, and Burnes said, "[o]kay, man we are going to leave this alone."
After shaking hands with Burnes, Peters turned around, and Burnes shot him in the head from the rear. When asked why he turned around, Peters replied, "I don't know sir. Because I thought everything was over and I turned around." Peters recalled five shots being fired. As a result of the shooting, Peters is paralyzed in his left arm and the left side of his body, he walks with a limp, and part of his skull has been replaced with an iron plate.
Peters denied that anyone in the van shot a gun; however, Peters apparently lost consciousness because he testified that he was at the hospital when he "came to." He never saw the shots that hit Rayford. Peters also asserted that only he spoke to Burnes during the encounter. Peters admitted to discussing the incident with Charles Jackson since it happened. Further, Peters admitted that some of his trial testimony could have come from Charles Jackson.

Testimony of Paul McGarry
Dr. Paul McGarry is a forensic pathologist. He performed the autopsy of Rayford in Orleans Parish. Rayford died from a fatal bullet that entered his head behind and below the left ear and traveled through the brain to the right temple, from whence it was recovered. This bullet was introduced into evidence at trial. Rayford's body also suffered wounds to the center of the back, the back of the head, and the scalp. In total, five separate wounds were examined. Two of the wounds were in line, showing that they could have been inflicted by the same bullet. Powder burns known as stippling were found on the body. The wounds indicate that the shots came from Rayford's left and behind his shoulder and are consistent with Rayford sitting in the driver's seat of the van and someone shooting into the van. Blood and urine tests were negative for alcohol and drugs.

Testimony of Charles Jackson
Charles Jackson ("Jackson") was twenty five years old at the time of trial. Jackson has a child with the Peters brothers' sister and was living with the Peters family at the time of the shooting in 2004. At that time, Jackson suffered from a drug problem; however, by the date of trial, Jackson no longer had a drug problem. Jackson asserted that drugs had nothing to do with the shooting.
Jackson had never seen Burnes until the date of the shooting. Jackson returned home after picking up his paycheck at work, and the Peters brothers informed them of an incident with a man around the corner. Jackson went with them to "resolve the situation."
Jackson denied having a gun when he went with the Peters brothers. He testified that Rayford drove; Peters sat behind Rayford; and that he rode in the front passenger seat. Jackson recalled Peters and Burnes talking. They agreed that "everything was going to be straight" and shook hands. Jackson turned around and heard a gunshot. He saw blood on Peters head.
Jackson was shot three times, once in his left arm and twice in his stomach. Jackson recalled seeing Burnes shooting a gun. Burnes was outside the van's driver's side window, shooting in the direction of Rayford and him. Rayford slumped over onto Jackson after being shot. Burnes continued shooting after Rayford slumped over. The first shot Jackson heard was when Peters was shot in the head. Burnes shot at Rayford and Jackson after that first shot at Peters. Jackson denied that either of the Peters brothers or he had a gun in any of their hands when the shooting began. There was a gun between the seats on the floor in the van, but he denied that anyone moved it. After the shooting, Burnes ran up the street. At that time, Jackson got out of the van, ran to the drivers' side, pushed Rayford into the middle, and drove to the hospital.
On cross examination, Jackson admitted that he was high on cocaine during the entire incident. He had consumed the drug an hour before going to Burnes' house. Jackson also admitted to having two convictions for possession of marijuana and a second degree battery conviction. Jackson also admitted to placing a 9-millimeter Lueger in the van. The Lueger and the other weapon were owned by Rayford. The men took three clips with them  one for each gun and an extra. The guns were placed between Rayford and Jackson. The guns were taken for protection, and Jackson would have used one had he had the chance. Before Burnes approached the van, Jackson placed one of the guns on the right side of his leg. Jackson also admitted that when he got out of the van he picked up the gun and pointed it at Burnes. However, the clip fell out, and he was not able to shoot the weapon.

Testimony of Captain Robert McNab
Captain Robert McNab of the St. Bernard Parish Sherriff's Office was in charge of the homicide investigation in this case. Two weapons were gathered during the investigation. One of the weapons was recovered from the rear seat of the van in which the victim was shot while the other weapon was recovered from a vacant lot at the scene of the crime. A search of the victim's personal belongings produced a purchase receipt for one of the weapons  a Hi-point nine-millimeter belonging to the victim. Checking with the Bureau of Alcohol Tobacco and Fire Arms ("ATF") revealed that neither of the recovered weapons was reported stolen. According to the ATF files, one of the weapons belonged to Rayford and the other belonged to Danny Boy Elmore. Two shell casings and a "projectile" were also recovered from the van. The projectile or bullet was discovered in the passenger side door, and the angle of the hole indicated that it had entered from the driver's side of the cab. A second bullet was recovered from the victim's head. A ballistics test revealed that the two recovered bullets came from a single weapon other than the two recovered in the investigation. The recovered casings were fired from the same gun as the recovered bullets. The murder weapon was never found, nor was any AK-47 recovered. The investigation  including witness testimony and forensics evidence  showed that shots were initially fired from the drivers' side rear window, with subsequent bullets fired from the driver's side window. The investigation also showed that Burnes was the shooter.
Burnes turned himself in to New Orleans authorities several days after the shooting and was returned to St. Bernard Parish. At that time, Burnes gave a statement to the media. The police subpoenaed this statement and coverage of his surrender, and it was played at trial for the jury. There was only one dead person at the time Burnes turned himself in; however, Peters was critically injured and was not expected to live at the time.
On cross-examination, Captain McNab testified that one of the guns had been retrieved from under the rear seat, where Captain McNab opined that Peters had been situated. This gun had originally been registered to Danny Boy Elmore. It was subsequently sold to someone else. Captain McNab had no records showing the subsequent history of the weapon because his records had been destroyed in the storm. According to Captain McNab's recollection, "that party" informed him that the gun may have been stolen at some point; however, police records indicate the gun was never reported stolen. Captain McNab recalled that the latter owner was a security guard whom he had spoken to by phone. After refreshing his memory with a supplemental police report, Captain McNab recalled that the purchaser of the gun from Mr. Elmore had a gun stolen from him some twelve years prior to the instant incident. However, Captain McNab recalled some confusion over whether the stolen gun was the same gun purchased from Mr. Elmore.
Burnes' mother's house was searched. This search produced no weapons. The gun and the magazine discovered outside the vehicle at the scene of the shooting were discovered some distance apart from each other. The gun was recovered without a clip. Captain McNab explained that there had been reports that a crowd had gathered and the evidence was being tampered with before the police arrived. No identifiable fingerprints were retrieved from the shell casings recovered from the vehicle.

Testimony of Jeff Goudeau
Jeff Goudeau ("Goudeau") is a forensic scientist with the Louisiana State Police Crime Laboratory. He authored a report introduced into evidence and qualified as an expert in forensic analysis and firearm identification.
Goudeau was provided with the following from the St. Bernard Parish Sherriff's Office: 1) a nine millimeter Hi Point Model C-9 semi-automatic pistol, serial no. P189885; 2) a nine millimeter Ruger, model P89, serial no. 30561136; 3) two full metal jacket bullets; 4) two Winchester nine millimeter cartridge cases; 5) a lead bullet core; and 6) a piece of a bullet jacket.
A comparative analysis showed that the jacketed bullets were fired from an unknown firearm. The Winchester nine-millimeter cartridge cases were also fired from the same unknown firearm. The rifling on the bullets indicated they were fired from a Hi Point firearm. However, the individual striae of the bullets could not be matched to the Hi Point gun recovered in the investigation.

Testimony of Lee Burnes, Jr.
Lee Burnes ("Lee") is Burnes' older brother. Though Lee did not know anything about the actual shooting, he testified about an incident that occurred on the morning of the shooting.
At sometime between eight and nine in the morning on the day of the shooting, Lee was walking home to his mother's house to get a ride to work. As Lee approached the corner of Daniel and Genie Streets, he observed a blue and white or blue and silver van speed by, running a stop sign. The van proceeded past another stop sign before it backed up to stop at a location where Burnes was washing his car. The driver exited and approached Burnes. Burnes apparently could not see the man approach because the doors and trunk on his car were open. As the man approached, Lee saw Burnes stand up. Lee could not hear the conversation at first. Burnes then grabbed his keys and exclaimed, "I did not call you, because I don't know you." At that point, a passenger exited from the van, and Lee ran over to the incident. One of the men had a light complexion, and the other had a dark complexion. Believing that "they was up to something," Lee pushed the two men. The dark skinned man fell. As he fell, a gun fell out of the dark skinned man's pocket. Some twenty or thirty seconds later, the two men escaped in the van.
Lee ran into his mother's house. Burnes closed his car and parked it in front of the same house. Lee asked Burnes if he knew the two men and received a negative answer. Lee had not seen them before, but he recognized the light skinned man at trial.

Testimony of Albert E. Calvin, Jr.
Officer Albert E. Calvin, Jr. was a Detective Lieutenant in the Detective Bureau of the St. Bernard Parish Sherriff's Office and was involved with investigating the shooting and death of Rayford. When the first officers responded to that crime scene, they were informed that "the vehicle had left and went to Chalmette Medical Center." Officer Calvin processed the vehicle at the hospital.
The vehicle was impounded, and Officer Calvin conducted a more detailed examination at the Criminal Investigation Bureau Office. A casing was recovered from one of the front door jams. The casing had a red substance on it. The red substance was not tested; however, the shell was tested for fingerprints and handgun comparison. A nine millimeter Reuger model P89 was recovered from the rear passenger side of the vehicle. This gun and other evidence were sent to the State Police for handgun comparison. Officer Calvin opined that the gun belonged to one of the people in the vehicle; however, he did not know who had touched it.
Another casing was recovered from the front passenger side door. A bullet fragment was also recovered from the rear floor of the vehicle. A brass colored fragment thought to be a bullet jacket was recovered from the floor between the front seats. The jacket could have come from one of the two projectiles recovered but Officer Calvin had no proof. A magazine clip containing nine-millimeter shells was recovered from between the front two seats. This magazine did not appear to be for the recovered Reuger. Two spent nine millimeter casings were recovered. One was found between the front two seats, and the other was found by the driver's door. What was believed to be blood was splattered all over the inside of the vehicle.
The St. Bernard Parish Sherriff's Office searched the neighborhood for witnesses but could find no one to come forward. They did not find Burnes at his mother's house. He subsequently surrendered to the New Orleans Police Department.
The crime scene revealed that three men had been shot in a car. One man was shot in the back of the head. One bullet found in the passenger's side door had been fired from the driver's side. A Reuger was found in the back seat. Officer Calvin had to enter through the rear of the van and move a lot of objects and circumvent what appeared to be blood in order to retrieve the gun. What appeared to be brain tissue was present on the van roof. Only Rayford had an open head wound. Peters had suffered a wound from a bullet entering the back of his neck and exiting the top of his head.
Two magazines were recovered. One magazine was recovered from the van, located between the driver and front passenger seats. One magazine was recovered from Daniel Street, with a weapon. Officer Calvin possessed no evidence to determine whether anyone had discharged a weapon inside the van. Nor was there any evidence to determine whether any of the victims discharged a firearm.

Testimony of Kendra Simon
Kendra Simon ("Simon") is twenty years old. She denied knowing Burnes at trial. Burnes' sister does Simon's hair. In July of 2004, Simon lived on Daniel Street. Simon also knew Peters enough to recognize him and knew Charles Jackson.
Between approximately one and three in the afternoon on the date of the incident, Simon saw Peters and Burns. She claimed to see the shooting. Simon was riding her bike on Guerra Drive when she saw a blue van. She also saw a woman on the sidewalk, telling Peters to "hurry up and do what you have to do." She had never seen the woman before. Three men ran to the van, each with a gun in his hand. The men were "Peters", "Charles", and "Rayford."
By the time Simon reached the corner of Daniel and Stacey Streets, the van had reached the corner. Burnes was crossing the street towards his house when the van blocked him. Burnes attempted to walk around but it cut him off. Words were exchanged, and the driver reached out the window with a gun. The driver was Rayford. Simon learned of his name from Burnes' trial counsel and by hearing the victim's name in court. In the verbal exchange one of the van passengers said, "Now, F that. Now, kill this N[-]." (explicative omitted). Rayford then reached out with the gun. Burnes grabbed Rayford's hand, and a struggle ensued. The gun went off, and Simon fell in a ditch with her bike. She did not see what happened to the gun after that. However, on cross-examination, she testified that she heard several shots after she fell and lay in the grass. Simon was approximately two houses away when she saw this incident. When Simon got back up, the van had run into a mailbox on the corner. A passenger exited the van and went to the driver's side. He had a gun in his left hand. Simon laid back down in the grass and heard the van leave. Simon did not see anyone actually shoot a gun. Nor did she see the van driver's gun leave his hand. Simon spoke only to Burnes' mother and defense counsel about this incident. She spoke to Burnes' mother the night of the incident. She denied knowing the police were searching for Burnes. She also spoke to the attorney representing Burnes prior to the attorney who represented him at trial. She never discussed the incident with Burnes' sister. Simon had heard the name of Rayford before the incident, but had not seen him before. She had seen Peters before the incident.

ERRORS PATENT
The record includes one potential error patent and one error patent: 1) the record does not show whether Burnes was present at arraignment, and 2) the trial court failed to observe the proper sentencing delay.

NOT PRESENT AT ARRAIGNMENT
A review of the record fails to show whether the defendant was present at arraignment and pleading. This case began before Katrina hit Southeast Louisiana on August 29, 2005. St. Bernard Parish was devastated by this catastrophe. Court entries in the record provided only go as far back as March 1, 2007. The grand jury returned its original indictment for First Degree Murder on August 25, 2004. Presumably, any court entry prior to August 29, 2005 was destroyed by natural disaster. La.C.Cr.P. art. 555 provides that a failure to arraign the defendant or the fact that he did not plead is waived if the defendant enters upon trial without objecting thereto, and it shall be considered as if the defendant had pleaded not guilty. Burnes was tried on March 1-2, 2007. Nothing in the record indicates Burnes ever objected to his arraignment proceedings. The trial transcript shows no such objection. Because the record shows that no objection was made by the defendant to his not being arraigned or entering a plea when he went to trial, he is considered to have pleaded not guilty and waived any error in arraignment proceedings.

SENTENCING DELAY
The August 28, 2007 transcript shows that the trial court failed to abide by the requisite sentencing delay.
La.C.Cr.P. art. 873 provides
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
In State v. Augustine, 555 So.2d 1331, 1334 (La.1990), the Louisiana Supreme Court held that the trial court's failure to observe the twenty-four hour delay did not constitute harmless error even where the defendant failed to raise that issue on appeal.
In State v. Collins, 584 So.2d 356 (La.App. 4th Cir.1991), this Court discussed the Augustine case as follows:
In State v. Augustine, 555 So.2d 1331 (La.1990), the Supreme Court held that the trial court's failure to observe the twenty-four hour delay did not constitute harmless error, even if the defendant did not raise that issue as error on appeal, where the defendant challenged his sentence on appeal. In the present case, defendant does not challenge his sentence and he does not raise as error the failure of the trial court to wait twenty-four hours before imposing sentence. Therefore, this error is harmless.
584 So.2d at 359.
Here, the trial court denied Burnes' motion for a new trial immediately before sentencing him. Because there is no indication in the record that Burnes waived the delay required under La.C.Cr.P. art. 873, the failure to comply with that article is an error patent. Burnes, however, has not challenged his sentence, and he does not raise as error the failure of the trial court to wait twenty-four hours before imposing sentence. Therefore, this error is harmless under this Court's ruling in State v. Collins, 584 So.2d 356. See also State v. Burbank, XXXX-XXXX, p. 7 (La.App. 4 Cir. 2/27/02), 811 So.2d 1112, 1117.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, Burnes adopts an argument that suggests his conviction by a 10-2 jury verdict may be unconstitutional pursuant to recent U.S. Supreme Court trends concerning the Sixth and Fourteenth Amendments to the U.S. Constitution. In support, he cites, amongst other cases, United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005) and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000). The State argues that this issue is procedurally barred because it was never argued before the trial court.
Burnes' argument that the U.S. constitution dictates that he may only be convicted by a unanimous jury vote contradicts La. C.Cr.P. art. 782, which requires only ten of twelve jurors to vote guilty to convict a person of a crime "in which punishment is necessarily confinement at hard labor." Accordingly, he essentially challenges the constitutionality of La. C.Cr.P. art. 782.
As the State points out, the Louisiana Supreme Court recently stated:
While there is no single procedure for attacking the constitutionality of a statute, it has long been held that the unconstitutionality of a statute must be specially pleaded and the grounds for the claim particularized. State v. Schoening, 00-0903, p. 3 (La.10/17/00), 770 So.2d 762, 764 (citing Vallo v. Gayle Oil Co., 94-1238, p. 8 (La.11/30/94), 646 So.2d 859, 864-65). This Court has expressed the challenger's burden as a three step analysis. First, a party must raise the unconstitutionality in the trial court; second, the unconstitutionality of a statute must be specially pleaded; and third, the grounds outlining the basis of unconstitutionality must be particularized. Vallo v. Gayle Oil Co., Inc., 94-1238, p. 8 (La.11/30/94), 646 So.2d 859, 864-865. The purpose of these procedural rules is to afford interested parties sufficient time to brief and prepare arguments defending the constitutionality of the challenged statute. State v. Schoening, 00-0903, p. 3 (La.10/17/00), 770 So.2d 762, 764 (citing Vallo v. Gayle Oil Co., Inc., 94-1238, p. 8 (La.11/30/94), 646 So.2d 859, 865).
State v. Hatton, 2007-2377, p. 14 (La. 7/1/08) 985 So.2d 709, 719.
Review of the instant record fails to show that this constitutional challenge to La. C.Cr.P. art. 782 was ever raised before the trial court. Accordingly, this issue is procedurally barred from review by this Court.
However, assuming arguendo that this issue was properly preserved for appellate review, it possesses no substantive merit. The First Circuit addressed this issue in a robbery case by stating the following:
[T]he defendant contends he was convicted by a nonunanimous verdict in violation of the United States Constitution. He argues La. Const. art. I, § 17 and La.Code Crim. P. art. 782(A) are unconstitutional pursuant to Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and Jones v. U.S., 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).
La. Const. art. I, § 17(A) and La.Code Crim. P. article 782(A) provide that cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. The punishment for first degree robbery is necessarily confinement at hard labor. La. R.S. 14:64.1(B). The instant case was tried before a twelve person jury, ten of whom voted to convict the defendant of the offense.
Under both state and federal jurisprudence, a criminal conviction by a less than unanimous jury does not violate a defendant's right to trial by jury specified by the Sixth Amendment and made applicable to the states by the Fourteenth Amendment. See Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); State v. Belgard, 410 So.2d 720, 726 (La.1982); State v. Shanks, 97-1885, pp. 15-16 (La.App. 1st Cir.6/29/98), 715 So.2d 157, 164-165.
The defendant's reliance upon Blakely, Ring, Apprendi and Jones is misplaced. Those decisions do not address the issue of the constitutionality of a non-unanimous jury verdict; rather, they address the issue of whether the assessment of facts in determining an increased penalty of a crime beyond the prescribed statutory maximum is within the province of the jury or the trial judge, sitting alone. They stand for the proposition that any fact (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. See Apprendi v. New Jersey, 530 U.S. at 490, 120 S.Ct. at 2362-2363. Nothing in the referenced decisions suggests that the jury's verdict must be unanimous for a defendant's sentence to be increased. Accordingly, Louisiana Constitution article I, § 17(A) and La.Code Crim. P. art. 782(A) are not unconstitutional and, hence, not violative of the defendant's Sixth Amendment right to trial by jury.
State v. Caples, 2005-2517, p.15-16 (La. 1 Cir. 6/9/06) 938 So.2d 147, 156.
Therefore, assuming arguendo that this issue was properly preserved for review, we find no merit in this assignment of error.

ASSIGNMENT OF ERROR NUMBER 2
In his second assignment of error, Burnes avers the district court erred in denying his post verdict judgment of acquittal. He argues that the record contains insufficient evidence to sustain his second degree murder conviction. Burnes reasons that the record shows by a preponderance of the evidence that he killed Rayford Peters while in sudden passion or heat of blood. See La. R.S. 14:31.1. Accordingly, Burnes avers that his conviction should have been and should be reduced to the responsive verdict of manslaughter.
Though the record contains no copy of the motion filed in district court, the August 28, 2007 hearing transcript shows that Burnes argued to the trial court that he acted in self defense  not in sudden passion or heat of blood. Burnes does not present his self-defense argument here. Accordingly, he does not show the trial court committed error. In State v. Juluke, 98-0341 (La. 1/8/99) 725 So.2d 1291, the Louisiana Supreme Court wrote:
The Jackson standard does not provide a defendant with a means of splitting alternative and inconsistent defenses in different forums, raising one defense before the jury and when that fails, a second defense presupposing a different set of facts in an appellate court conducting sufficiency of review under Jackson and La. C.Cr.P. art. 821(E). 98-0341 at p. 4-5, 725 So.2d at 1293. The Court recognized this rule again in State v. Ware, 2001-2808 (La. 4/12/02) 816 So.2d 291, wherein it noted that "our jurisprudence prohibits" a defendant from presenting an "alternative and inconsistent" defense on collateral review to the defense presented at trial. See also, State v. Duvall, 97-2173, p. 8-11 (La. App. 1 Cir. 12/28/99) 747 So.2d 793, 799, citing Juluke, 725 So.2d at 1292-1293 (whereby the First Circuit Court of Appeal refused to consider the affirmative sudden passion and heat of blood defense that was presented for the first time on direct appeal by a defendant seeking to have a second degree murder conviction reduced to manslaughter.) Accordingly, the argument presented in Burnes' second assignment of error is procedurally barred from review by this Court.
Assuming arguendo that this assignment was not procedurally barred, we find it has no merit for the following reasons. This Court has stated the following law in analyzing sufficiency of the evidence arguments:
In assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979); State v. Rose, 607 So.2d 974, 978-979 (La.App. 4th Cir.1992), writ denied, 612 So.2d 97 (La.1993). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution; it must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, Id.

State v. Everett, 99-1963, pp. 5-6 (La. 4 Cir. 9/27/00), 770 So.2d 466, 470.
In Everett, this Court also stated the following regarding the jury's purview in making credibility determinations:
It is not the function of the appellate court to reassess the credibility of witnesses or to reweigh the evidence; the reviewing court's function is to determine the constitutional sufficiency of the evidence presented. State v. Johnson, 619 So.2d 1102, 1109 (La.App. 4 Cir. 5/13/93), writ denied, 625 So.2d 173 (La.10/1/93). Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder. State v. Brumfield, 93-2404 (La.App. 4th Cir.1994), 639 So.2d 312; State v. Garner, 621 So.2d 1203 (La.App. 4th Cir.1993), writ denied 627 So.2d 661 (La.1993). Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir.1989); Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id. A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
Id., 99-1963, pp. 8-9, 770 So.2d at 471.
This Court has stated the following on circumstantial evidence:
When a conviction is based on circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. R.S. 15:438; State v. Camp, 446 So.2d 1207 (La.1984). This is not a stricter standard of review, but it is an evidentiary guide for the trier of fact when it considers circumstantial evidence. State v. Porretto, 468 So.2d 1142 (La.1985). If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails; and, unless another one creates reasonable doubt, the defendant is guilty. State v. Captville, 448 So.2d 676 (La.1984).
State v. Fountain, 93-2561, p. 4 (La. App. 4 Cir. 12/15/94), 647 So.2d 1254, 1256.
Finally, in reference to the specific issue presented in this assignment of error, the Louisiana Supreme Court has stated the following on sudden passion or heat of blood manslaughter:
Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La.R.S. 14:31(1). Thus, the presence of "sudden passion" or "heat of blood" distinguishes manslaughter from murder. The court has stated on several occasions, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Tompkins, 403 So.2d 644 (La.1981); State v. Temple, 394 So.2d 259 (La.1981); State v. Peterson, 290 So.2d 307 (La.1974). Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Where such proof has been introduced, a second degree murder verdict is inappropriate.
State v. Lombard, 486 So.2d 106, 110 (La. 1986).
Burnes argues that, "[t]he facts [in State v. Clark, 93-2090 (La. App. 4 Cir. 5/17/94), 637 So.2d 1140] demonstrate far less in the way of blood letting than those in the instant case." Burnes attempts to use this case to represent a reduction from a second degree murder conviction to a manslaughter conviction. In Clark, the victim accosted the defendant after he failed to comply with the victim's request for a cigarette. The defendant left and returned with a pistol shortly thereafter. Upon returning, the defendant had an argument with the victim during which the defendant took out his weapon and shot the victim. Contrary to Burnes' reading of the case, this Court affirmed the second degree murder conviction. This Court found, "a rational trier of fact could very well have found that defendant failed to prove by a preponderance of evidence that he acted in `sudden passion' or 'heat of blood'." It is noteworthy that this Court observed that no evidence was presented to show the victim was armed or actively threatening the defendant.
Here, the record contains conflicting testimony among the witnesses. Simon testified that she saw Rayford reach out of the van with a gun before a struggle ensued between Burnes and him over the weapon. Peters, on the other hand, testified that he got out of the van, spoke and shook hands with Burnes twice, and reentered the van before Burnes shot him. In line with Peters' testimony, Charles Jackson testified that Peters spoke to Burnes and the two shook hands before Burnes shot Peters and then Rayford and himself. Resolving the conflict in this testimony is a question of weight of the evidence in the jury's purview and does not go to sufficiency. See State v. Everett, 99-1963, p. 9, 770 So.2d at 471. The jury apparently assigned less weight to Simon's testimony, rejected Burnes' self defense argument and found him guilty of second degree murder. This credibility determination will not be disturbed unless it clearly controverts the evidence.
The physical evidence collected in this case includes the following: 1) a nine millimeter Hi Point gun; 2) a nine millimeter Reuger gun; 3) two full metal jacket bullets; 4) two Winchester mine millimeter cartridge cases; 5) a lead bullet core; and 6) a piece of a bullet jacket. All of this evidence was transported to the Louisiana State Police Crime Laboratory for testing.
Goudeau, a forensic scientist, testified that the bullets and the cartridge cases were fired from the same gun. However, they were not fired from either of the recovered weapons. They were fired from an unknown weapon. Captain McNab testified that one of the weapons was discovered in the rear of the van. The other weapon and a magazine were discovered at the crime scene. He explained that the magazine and the latter weapon were discovered some distance apart because the evidence was tampered with by onlookers after the shooting took place.
This evidence comports with Peters' and Charles Jackson's testimony. They both admitted to taking two guns with them when Rayford and they drove in the van to discuss and settle their differences with Burnes. Two guns were discovered during the investigation, and none of the recovered bullets or striae were linked to them. Jackson admitted to attempting to shoot Burnes as he fled but testified that he was unable to shoot because his gun did not have a clip. This comports with the physical evidence, including a weapon found at the scene without a magazine.
Jackson testified that Burnes shot into the van from the driver's side of the car. This comports with Det. Calvin's testimony that a bullet found in the passenger side door had entered from the driver's side of the car. Det. Calvin also testified that there was no evidence to determine whether any of the victims discharged a firearm. This lack of evidence cannot be used to controvert either the victims' testimony or Burnes' theory of self-defense. Simon's testimony that she saw all three men enter the van with weapons in their hands is not supported or controverted by the physical evidence. However, she admitted at trial that she was lying in some grass and did not see the actual shots that she heard. Accordingly, she admitted that she did not see where the bullets came from. Her testimony does little to confirm or controvert Burnes' heat of passion argument presented here or his self-defense argument presented at trial.
Burnes points to no evidence that clearly controverts the jury's credibility determination. The evidence clearly shows that multiple gunshots were fired into the van from the same firearm. Captain McNab testified that ballistics tests of the bullets recovered from the van door and Rayford's head showed that they came from the same weapon. Dr. McGary's examination of Rayford's body revealed powder burns known as stippling which indicated close range shot wounds, consistent with Peters' and Charles Jackson's testimony. Both Peters and Charles Jackson testified that Burnes shook hands with Peters, indicating a quelling of ill will had been reached. The jury heard all of this testimony and determining whether to believe that the parties had shaken hands was well within their purview. Nothing in the record clearly controverts this determination. Accordingly, viewing all of the evidence presented at trial in a light most favorable to the state, Burnes has failed to meet his burden of showing by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood." Accordingly, even assuming that this assignment is properly before this Court, we find that this assignment has no merit.
Accordingly, we hereby affirm Burnes' conviction and sentence.
AFFIRMED
BELSOME, J., CONCURS IN THE RESULT.