394 So.2d 259 (1981)
STATE of Louisiana
v.
Dennis TEMPLE.
No. 80-KA-1700.
Supreme Court of Louisiana.
January 26, 1981.
*260 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Terry McAdams, Asst. Dist. Atty., for plaintiff-appellee.
M. Michele Fournet, Jeffery Calmes, Baton Rouge, for defendant-appellant.
DIXON, Chief Justice.
Defendant was convicted of two counts of attempted manslaughter and was sentenced to two concurrent terms of nine *261 years' imprisonment. He had been indicted on two counts of attempted first degree murder. The indictment recites that defendant's intended victims were two deputies, Callahan and LeBlanc. C.Cr.P. 473.
The only error assigned by the defense involves the prosecution's use of a recorded statement of one of the occupants of the house. The prior statement was inconsistent with the testimony given by the witness on the stand, and was thus admissible. R.S. 15:493. However, the statement was not introduced until the state's rebuttal. The defense claims that this worked a substantial prejudice upon his case, since "the defendant is without right to rebut the prosecution's rebuttal." R.S. 15:282. By waiting until the rebuttal to introduce the statement, rather than introducing it after the cross-examination of the defense witness had been completed, defendant argues that the prosecution effectively denied him the opportunity to rehabilitate the witness' credibility. This argument lacks merit. Defense counsel attempted to rehabilitate the witness on redirect; at that point, the witness' account was more consistent with her prior recorded statement than it was with her direct testimony. In addition, defense counsel could have asked the court for an opportunity to examine the witness once again, prior to argument. C.Cr.P. 765(5). By failing to do so, the error could be considered waived.
Although not raised by a motion for a new trial (see C.Cr.P. 851(1)),[1] and not preserved for review by assignment, and not briefed or argued, the question of sufficiency of evidence has been raised.
When an issue is not designated in the assignment of errors, the scope of this court's review is limited to those errors that are "discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." C.Cr.P. 920. (Emphasis added). By the terms of this limitation, the insufficiency of evidence is not an error that can be reviewed in the absence of an assignment.
In State v. Peoples, 383 So.2d 1006 (La. 1980), this court abandoned the rule that a defendant must file a motion for new trial in order to preserve the issue of sufficiency of evidence for appellate review. As a matter of due process, the court concluded that the issue could be considered when raised "upon formal assignment of error," notwithstanding the defendant's failure to move for new trial. 383 So.2d at 1007. To reach the issue in the present case, then, the court would be required to expand the rule of State v. Peoples to allow review even when the error has not been assigned, briefed or argued. And, if the issue is to be reached in an effort to do substantial justice, or as a matter of judicial efficiency, it would be necessary to disregard the explicit provision contained in C.Cr.P. 920(2).
Even if we could reach the question of the sufficiency of the evidence, a review should result in the affirmance of defendant's convictions. The events upon which the convictions are based present a bizarre and ultimately tragic story.
Two deputies of the East Baton Rouge Parish Sheriff's Office were investigating the theft of several six packs of beer from a convenience store. The manager of the store, who had followed the thieves as they drove away on a motorcycle, could describe the residence at which they later stopped. The two deputies located the residence, discovered a motorcycle in a ditch, and stopped to investigate. When they approached the house to pursue their questioning, Ms. Mickey Priester, the owner of the home, ordered them off the premises. Ms. Priester was said to have been extremely agitated, and screamed profanely at the officers. The two deputies left, and were later joined by another patrol unit of two deputies.
While parked in a nearby parking lot, the officers observed a motorcycle being driven at a high rate of speed. Believing that the motorcycle was the same one that they had *262 seen earlier, the four officers gave chase, and once again arrived at Ms. Priester's residence. The two deputies who made the initial investigation, Deputies Callahan and LeBlanc, emerged from their vehicle to question the driver and passenger on the motorcycle. At this point, Ms. Priester stepped out from behind a van parked in her front yard. She was armed with a .410 shotgun and a small caliber pistol.
Defendant also stepped into the officers' view. He was armed with a .12 gauge shotgun. According to the two officers' testimony, Ms. Priester and defendant began to scream profanely, threatening to kill the officers if they did not get off the property.
The officers' testimony is not entirely consistent. Deputy Callahan, who was immediately in front of Ms. Priester, stated that both she and defendant had their guns pointed at him. Both of them, he said, made threats to kill them. Deputy Callahan began backing away, and testified:
"She said, `If you don't think I'm going to kill you, I'll prove it to you'; and she fired a shot ... which went right over the top of my head."
Deputy Callahan scrambled back to the safety of his vehicle. He reported that he heard another shot from a "larger shotgun" as he was driving away.
Deputy LeBlanc was standing a short distance away from Deputy Callahan. He also reported that both Ms. Priester and defendant threatened to kill them, although it appears from his testimony that Ms. Priester was the more vociferous of the two. Deputy LeBlanc, however, stated that defendant's shotgun was "aiming somewhere in this vicinity on me," not on Deputy Callahan. As the officers were retreating from the premises, Deputy LeBlanc recalled this series of events:
"... she screamed, `you mother-fuckers don't think I'll shoot, I'll prove it.' She came charging, and she tripped; and right when she tripped, the gun discharged. She tripped, and it pulled up, uh, right over our heads, the shot did."
It was Deputy LeBlanc's opinion that Ms. Priester's aim was thrown off when she stumbled; otherwise, he speculated, they might have been hit. Deputy LeBlanc safely made it to the patrol unit, and the two officers began to race away. As they drove off, he testified that he heard a "large report from a shotgun"; he reported seeing a muzzle flash in the vicinity where defendant had last been standing. At the time, Deputy LeBlanc believed that the shot had been fired in the other officers' direction. Deputy LeBlanc, an unpaid reserve officer when these events took place, stated that he had never been so scared in all his life; he believed that Ms. Priester was trying to kill him and Deputy Callahan.
The two other deputies who were in the immediate vicinity, Deputies Montgomery and Cockerham, also gave somewhat conflicting accounts of the events of that night. Deputy Montgomery remembered that Ms. Priester had threatened to shoot, but he stated, "She wasn't aiming straight at them. She was shooting at an angle like over their heads like a warning shot." He did not mention whether Ms. Priester had stumbled, but did report that defendant simply stood passively, acting like a guard. Additionally, Deputy Montgomery recalled that Ms. Priester fired only with the pistol, not the shotgun; that one to three shots were fired; and that the pistol was fired into the air. Significantly, he did not recall any other shots being fired:
I can't remember the white male firing a shotgun. It might have went off. I don't remember hearing it `cause everything was going just split seconds."
Deputy Montgomery testified, however, that he would have heard the report of the shotgun if defendant had fired it.
Deputy Cockerham stated that he was close enough to the other officers to be able to see a great deal. He testified that Ms. Priester fired some shots, although he could not remember whether she used the shotgun or the pistol; he stated, however, that she did not fire up into the air. Deputy Cockerham did not see defendant fire any shots; if he had, he stated, "I would have seen him."
*263 A radio call was immediately made, reporting that the officers had been fired upon. Within minutes, approximately fifty law enforcement officers converged upon the scene. They surrounded the house and ordered the occupants to come out. Four persons emerged from the home; defendant and Ms. Priester remained inside. Defendant was clearly visible at the front of the house; Ms. Priester walked to the rear. When neither would obey the officers' orders to come out of the house, two canisters of tear gas were fired into the home. Ms. Priester, fleeing into the back yard, fired several shots at this time.[2] A state trooper fired a total of fifteen rounds at Ms. Priester, who was killed. Defendant came out of the front of the house unarmed and with his hands in the air. The .12 gauge single shot shotgun was found to have one live shell in the chamber. The record does not disclose whether a ballistics test was made on the weapon, or whether any of the officers examined the gun to see if it had been recently fired. Apparently a spent shell was never recovered, although a search was made.
In reviewing claims of insufficient evidence, this court has adopted the standard established in Jackson v. Virginia, 443 U.S. 307, 322, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560, 575-76 (1979):
"... A challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim...."
A review of the evidence clearly indicates that there was not sufficient evidence to prove, beyond a reasonable doubt, that defendant ever fired his shotgun. The two deputies who were involved in the encounter merely reported hearing a shotgun blast as they raced away in their vehicle; one stated that he saw a muzzle flash in the vicinity where defendant had been standing. Nothing in the record indicates that, under these highly charged circumstances, the two officers would have been able to distinguish accurately the sound of a shot fired from a .410 shotgun as opposed to a .12 gauge shotgun. The two other deputies, who were in a position to observe the events but who were not in a zone of immediate danger, could not recall any shots being fired after Ms. Priester's gun discharged. Both testified that they would have seen or heard the firing of defendant's shotgun if he in fact had fired it. Moreover, a spent shell was never recovered, even though a search for it was made; defendant's single shot gun had a live round in the chamber when it was recovered; and there was no other testimony or evidence to indicate that the gun had been fired that night. These circumstances are sufficient to create a reasonable doubt that defendant ever fired a shot.
It must be noted, however, that the jury was given instructions concerning the law of principals, R.S. 14:24. A person who aids, abets or counsels another in the commission of an offense is equally responsible for the crime. Although the state failed to prove that defendant pulled the trigger of his shotgun, defendant can be held criminally responsible for the actions of Ms. Priester. There can be no doubt that defendant was "concerned in the commission of the crime" perpetrated by Ms. Priester. Armed by her, he stood by while she excoriated the officers, and echoed her threats; he was a participant in a course of conduct pursued by Ms. Priester that involved homicidal risk. Should the evidence support a finding that Ms. Priester was guilty of attempted manslaughter, defendant's conviction for that crime must stand.
Attempted manslaughter is a responsive verdict to the charge of attempted first degree murder. C.Cr.P. 814(A)(2). In cases where a defendant is indicted for murder and convicted of manslaughter, yet the evidence would have supported a finding of guilt on the greater offense, it is not necessary to determine whether the evidence adduced at trial was tailored to the *264 lesser included charge. The general rule, which has undergone some modifications, was established in State v. Cooley, 260 La. 768, 773, 257 So.2d 400, 402 (1972):
"If there is sufficient evidence in the record to support a conviction for a greater offense (which includes the one for which the defendant is convicted), the evidence necessarily and automatically will support a conviction of the lesser offense which has been made responsive by legislative action."
In Cooley, the defendant was indicted for murder and convicted of manslaughter. He argued on appeal that the record was devoid of any evidence tending to show that he had been provoked by the decedent, or that he committed the homicide in sudden passion or heat of blood. The court rejected this argument because both murder and manslaughter are deliberate homicides, involving the same degree of intent. The only difference between the two (at that time) was that the intent involved in manslaughter was the product of provocation, taking form in sudden passion.
The rule was further elaborated in State v. Peterson, 290 So.2d 307 (La.1974), which involved similar facts. There, the defendant argued that the definition of manslaughter involved elements that were not essential for a conviction of murder. Thus, the defendant argued that the murder indictment did not fully apprise her of the crime of which she could be convicted. The court rejected the argument, noting that the only difference between murder and manslaughter was that the latter crime involved provocation followed by sudden passion. As the court correctly observed, the presence of passion in such a case is not actually an element of the crime, but is in the nature of a defense: "... it is a factor which exhibits a degree of culpability less than that present when the homicide is committed without passion caused by provocation." 290 So.2d at 310. The following rule was articulated:
"... a verdict of manslaughter may readily be seen as responsive to a charge of murder, and without resort to review of the evidence as is done by some other jurisdictions. In Louisiana, when there is evidence to prove the greater offense, it is the jury's province to determine the existence vel non of lesser culpability and exercise the statutory right to return the manslaughter verdict. See State v. Cooley, 260 La. 768, 257 So.2d 400 (1972). This Court will not look to the evidence to make such a determination."
When the state has adduced sufficient evidence to obtain a murder conviction, yet the defendant is convicted of manslaughter, the state's failure to prove elements such as "passion" and "provocation" is of no moment. Such "elements" are essentially mitigatory factors, bearing on the character of intent, which the jury is free to infer from the evidence.
The general rule regarding the validity of responsive verdicts is not without its limitations. A legislatively authorized responsive verdict cannot stand if it offends a constitutional principle. For example, a defendant cannot be convicted of a responsive verdict involving criminal conduct that was not actually included within the charge named in the indictment. See State v. Booker, 385 So.2d 1186 (La.1980). No such constitutional problem exists in this case, because the criminal conduct of which manslaughter is comprised is the same as the conduct involved in first degree murder.
Moreover, a responsive verdict cannot stand if there is no proof of an essential element of the crime, even though there was full proof of all the elements of the greater offense. See State v. Dauzat, 392 So.2d 393 (La.1980). Again, such problem does not exist in the present case, where the defendant was indicted for first degree murder; the presence of passion or provocation is a mitigatory factor, in the nature of a defense that is within the jury's sole province to determine.[3]
*265 Our inquiry must be focused, then, on whether Ms. Priester's actions constituted attempted murder within the meaning of R.S. 14:30 and R.S. 14:27. At the time the offense was committed, in October 1978, the first degree murder statute provided:
"First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm."
The statute defining attempt provides:
"A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended."
It is undisputed that Ms. Priester armed herself with two weapons and waited in her front yard in anticipation of the arrival of the deputies. The critical inquiry is whether there was sufficient evidence to prove that she possessed the requisite intent, that is, that she actively desired the death of the two deputies. R.S. 14:10(1). If Ms. Priester intended to hit one or both of the officers when she fired her gun, there can be no doubt that she could have been convicted of attempted first degree murder.
Deputy Callahan's testimony, along with Deputy LeBlanc's, is convincing proof that Ms. Priester and defendant threatened to kill them. Deputy Callahan reported that Ms. Priester made a homicidal threat immediately before she fired her gun. It was estimated that Ms. Priester was approximately six to eight feet away from Deputy Callahan when the gun went off. Deputy LeBlanc corroborated this testimony, stating that defendant and Ms. Priester screamed such things as "get off my land or I'm going to kill you" and "we're going to blow y'all away." It was Deputy LeBlanc's opinion that Deputy Callahan might have been hit if Ms. Priester had not stumbled. Both deputies testified that Ms. Priester's gun was trained on Deputy Callahan.
Deputy Montgomery, when asked to describe what defendant and Ms. Priester were saying, admitted that his memory was not perfect, but stated that it was "something about, `you pig, get off my property,' uh; `if you don't believe I'll shoot, I'll show you' or `I'll kill you.' This is all mixed in there together." However, Deputy Montgomery seemed certain that Ms. Priester was not aiming at the officers, but was shooting over their heads "like a warning shot." He did not mention whether he had seen Ms. Priester stumbling. According to Deputy LeBlanc, the fact that Ms. Priester tripped accounted for her arm being thrown into the air. Deputy Cockerham, who was standing near Deputy Montgomery, testified that Ms. Priester did not fire up into the air: "She fired in a level direction." He steadfastly maintained this position throughout cross-examination, noting that he could see "the direction the fire was flashing" and "the direction of her arm."
The testimony of one other witness has bearing on the question of intent. Virginia *266 Bankston, a visitor at Ms. Priester's home, testified that she saw Ms. Priester fire two shots in the air. Before the confrontation with the officers, Ms. Priester is said to have told defendant, "let's scare the pigs off of our land." The prosecution attempted to discredit this account by playing a recorded statement of Ms. Bankston, in which she said that she was awakened from sleep when she heard shots fired. Ms. Bankston could not have seen what she testified to seeing, nor heard the remarks she testified to hearing, if she was asleep in bed up until the time the shots were fired.
Defendant also took the stand. He stated that Ms. Priester gave him a shotgun when she saw the police return, and told him "we're going to go scare them, these, uh, cops off; they keep coming over here without no search warrant ..." However, he also testified that he heard two shots fired before he got in a position where he could see the two deputies; he did not see Ms. Priester shoot her weapon.
Based upon this testimony, the jury could have concluded, beyond a reasonable doubt, that Ms. Priester fired a gun with the intent to kill. Deputy Callahan, the officer standing nearest to Ms. Priester, testified that she fired a shot which narrowly missed him. Deputy LeBlanc, the other officer who was closest to Ms. Priester, stated that she kept her gun aimed at Deputy Callahan throughout the encounter, and that the barrel of the gun was pulled up only because she stumbled. Deputies Callahan and LeBlanc were standing close to one another, and Deputy LeBlanc admitted that he did not know whether Ms. Priester intended to shoot him or Deputy Callahan. This evidence, coupled with Ms. Priester's repeated homicidal threats, is sufficient for the finding that she intended to kill or maim the two deputies, and sufficient to support defendant's convictions of attempted manslaughter.
The convictions and sentences are affirmed.
BLANCHE, J., concurs in the result.
DENNIS, Justice, concurring.
I respectfully concur.
One who aids and abets in the commission of a crime may be charged and convicted with a higher or lower degree of the crime, depending upon the mental element proved at trial. Thus, an individual may only be convicted as a principal for those crimes for which he personally had the requisite mental state. State v. Holmes, 388 So.2d 722 (La.1980); State v. McAllister, 366 So.2d 1340 (La.1978). Although I find the question troublesome and extremely close, I believe the evidence is sufficient to support a finding beyond a reasonable doubt that Temple aided, abetted or counseled Priester in the commission of the offense and actively desired the death or great bodily harm of the two deputies.
MARCUS, Justice, concurring.
Since La.Code Crim.P. Art. 920 (scope of appellate review provides: "[t]he following matters and no others shall be considered on appeal: (1) an error designated in an assignment of errors; and (2) an error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence," I do not reach the question of sufficiency of evidence. Accordingly, I concur in the result only.
NOTES
[1] The record discloses that defendant only filed a notice of appeal, in proper person. His trial counsel withdrew, and the services of the Public Defender's Office were retained for perfecting the appeal.
[2] Both Deputies Callahan and LeBlanc testified that they were at the front of the house when these shots were fired. They therefore could not have been Ms. Priester's intended targets.
[3] The foregoing analysis is limited to the "heat of passion" manslaughter provision, R.S. 14:31(1). This was thought necessary because of the logical incongruity of juxtaposing the attempt statute with paragraph (2) of the manslaughter statute. R.S. 14:31(2) provides in part that manslaughter is a homicide committed "without any intent to cause death or great bodily harm." The attempt statute, of course, requires that the would-be perpetrator of a crime have the specific intent to commit the offense. As observed in State v. Booker, supra, (Lemmon, J. concurring, joined by Dixon, C.J.):

"... In a logical analysis one cannot specifically intend (attempt) to do something that one does not intend to do. One therefore cannot attempt to kill a human being ... without intending to kill the victim...." 385 So.2d at 1193. Thus, for the sake of logical consistency, it must be thought that the jury's verdict relates to paragraph (A) of the statute, involving a heat of blood homicide. There is no reason to review the evidence to determine whether the deputies' actions constituted a "provocation sufficient to deprive an average person of his self control and cool reflection."