STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

24-163

STATE OF LOUISIANA

VERSUS

TAVEON MALIK LEARY

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 172952
HONORABLE ROYALE L. COLBERT, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Shannon J. Gremillion, D. Kent Savoie, and Van H. Kyzar,
Judges.

AFFIRMED AND REMANDED
WITH INSTRUCTIONS.

**Douglas Lee Harville**
**The Harville Law Firm, LLC**
**P.O. Box 52988**
**Shreveport, LA 71135-2988**
**(318) 222-1700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **Taveon Malik Leary**

**Jason W. Robideaux**
**113 W. Convent Street**
**Lafayette, LA 70501**
**(337) 443-9262**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **Taveon Malik Leary**

**Donald D. Landry**
**District Attorney**
**Lance C. Beal**
**Assistant District Attorney**
**Fifteenth Judicial District**
**P.O. Box 3306**
**Lafayette, LA 70501**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**KYZAR, Judge.**

Defendant, Taveon Malik Leary, appeals his conviction for second degree murder, asserting that the evidence was insufficient to support the jury verdict and negate his claim of justification by self-defense. For the reasons herein, we affirm the conviction and remand with instructions.

## PROCEDURAL HISTORY

Defendant was indicted by a grand jury in Lafayette Parish and charged with the March 24, 2019 second degree murder of Kendrick L. Flugence, in violation of La.R.S. 14:30.1. Trial began on February 7, 2023, and on February 13, 2023, the jury returned a unanimous verdict of guilty as charged. Thereafter, Defendant filed a motion for a new trial and a motion for post-verdict judgment of acquittal, both of which were denied on June 12, 2023. On that same date, the trial court sentenced Defendant to life imprisonment at hard labor.

This appeal followed, wherein Defendant asserts two alternative assignments of error:

1.    The State failed to prove beyond a reasonable doubt Mr. Leary did not shoot Mr. Flugence in self defense [sic]. Mr. Flugence repeatedly threatened to kill Mr. Leary for a week before the shooting. On the day of the shooting, Mr. Leary shot Mr. Flugence only after Mr. Flugence and his father repeatedly threatened to kill Mr. Leary. Given these facts, the evidence was insufficient to prove Mr. Leary was guilty of second degree murder beyond a reasonable doubt.

2.    In the alternative, the preponderance of the evidence shows Mr. Leary killed Mr. Flugence in sudden passion or heat of blood which would have deprived an average person of his self control [sic] and cool reflection. Given these facts, the jury erred in convicting Mr. Leary of second degree murder. Accordingly, this Court should reverse Mr. Leary's second degree murder conviction, vacate his sentence for second degree murder, enter a verdict of guilty of manslaughter, and remand this matter for resentencing.

# OPINION

*Insufficiency of Evidence and Self-Defense*

We first consider Defendant's claim that the evidence was insufficient to support the verdict of second degree murder. Specifically, Defendant claims that the State failed to negate his claim that the killing of the victim was justified by self-defense.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As it pertains to this case, La.R.S. 14:30.1(A)(1) defines the crime of second degree murder as "the killing of a human being[]" "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Specific "intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent can be "formed in an instant" and "may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Brown*, 16-998, p. 42 (La. 1/28/22), 347 So.3d 745, 787, *cert. denied*, __ U.S. __, 143 S.Ct. 886 (2023). The element of specific intent to kill can also be inferred from

2

the perpetrator's act of pointing a gun at the victim and firing it. *State v. Reed*, 14-1980 (La. 9/7/16), 200 So.3d 291, *cert. denied*, 580 U.S. 1166, 137 S.Ct. 787 (2017).

This case involves a claim of self-defense by Defendant. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A)(1). When the accused raises the defense of justification, the State must prove beyond a reasonable doubt that the crime was not committed in self-defense. *State v. Matthews*, 464 So.2d 298 (La.1985). "[T]he relevant inquiry on appeal . . . is whether a rational factfinder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense." *State v. Garcia*, 483 So.2d 953, 956 (La.1986). "When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt." *State v. Dunn*, 21-630, p. 13 (La.App. 1 Cir. 12/22/21), 340 So.3d 77, 86, *writ denied*, 22-95 (La. 4/5/22), 335 So.3d 834.

After reviewing the evidence presented at trial, we find sufficient evidence to prove beyond a reasonable doubt that Defendant was not acting in self-defense when he shot and killed the victim. The evidence established that the victim was shot and killed on March 24, 2019, at the Mont Chateau Apartments in Lafayette, Louisiana. He and Defendant had had a verbal dispute earlier, which subsided and then re-escalated when the victim's father arrived at the apartment complex.

Laureniana Thomas, the victim's girlfriend, testified that she and the victim, along with her brother and mother, had moved into the apartment complex

3

approximately one week before the shooting. She and the victim had been in a relationship for about two-and-a-half years at that time. She stated that the victim and Defendant, who also lived at the complex, had exchanged confrontational words the previous Friday:

> Q. Did you hear [the victim] talk about wanting him to fight Taveon?
>
> A. When they were arguing the Friday, Kendrick asked him, "What, you want to fight?" Taveon said, "No, I don't fight. I sling iron."
>
> Q. What does that mean to you?
>
> A. He has a gun.
>
> Q. Okay. Did you feel threatened when he said that?
>
> A. Yes. That is why we left.

Ms. Thomas testified that earlier on the day the victim was killed, he had argued with Defendant until she intervened and got the victim to go into their apartment and calm down. She stated that the victim was not armed with a firearm that day nor had she ever known him to carry a gun during their relationship. She said that when the victim's father arrived at the complex, the victim went back outside where the argument between him and Defendant started anew:

> So I get downstairs and like I said, they were just fussing. Kendrick took off his shirt and threw it on the ground. I'm like, "What are y'all doing? Ya'll have no reason to be fighting. There's no real beef. You should not be fighting." Basically when Kendrick took off his shirt, he said, "I don't have any guns. Just fight me, just fight me." And he pulled down his shorts. His boxers were showing so that he did not have any guns on him. Once he pulled down his shorts, Taveon broke loose from whoever was holding him and basically chased him down. And we all spread out.

She went on to describe the events before and after Defendant started shooting the victim:

> Q. What happens at that point?

4

A. We saw [Defendant] break loose. And when he breaks loose, we all basically separated. Like I said, KJ pushed me, and I ran. If I'm not mistaken, I think it was the truck. I ran around the truck. By the time I made it in front of the truck, KJ was on the ground. And he was standing over him.

Q. Okay, and what did you do?

A. I just heard gun shots. I just blacked out and started screaming.

Q. Did you -- How many gun shots did you hear?

A: I'm not sure.

Q. Was it one?

A. No. It was a lot. I don't know how many for sure.

Q. Who did you see with a gun on them?

A. Taveon.

Before the victim was shot, there had been no physical altercation, and neither Defendant nor the victim had touched the other. When asked if Defendant "started shooting KJ when he saw that he did not have a gun[,]" she replied, "Yes." She concluded by stating that the victim was in a "fetal position" as Defendant was standing over him, shooting at him multiple times. After Defendant finished firing the gun at the victim, he left the scene. She and the victim's father tried to get the victim, who had been shot multiple times and was bleeding profusely, up a stairwell to their apartment. Police arrived on the scene within a few minutes after the shooting, and an officer took over CPR.[1]

Kendrick Flugence, Sr., the victim's father, testified that his son had just moved into the apartment complex a few days before, and on the day of the shooting, he called him to come over to the complex. Mr. Flugence stated that when he asked

---

[1] Cardiopulmonary resuscitation.

5

him, "What's up? What's the matter[,]"his son replied, "This dude keeps . . . He fucking with me." Mr. Flugence then described what occurred after his arrival:

> There was a dumpster. I parked close to the dumpster. I seen this car. I got down and walked. When I got down, to me, I did not see but one person in the parking lot. I did know where his apartment was. Maybe two minutes of me walking towards his car, the apartment door opened. He come outside and "Oh, my daddy there." So he come outside, and I'm like, "What's up?" He's like, "Man, this dude keeps fucking with me." I'm like "Where he's at," and he's pointing to the only person that was out there.

Mr. Flugence identified Defendant in open court as the man confronting his son at the apartment. In the following colloquy, he described what happened in the moments before and during the time his son was shot multiple times by Defendant:

Q.   What was [Defendant] wearing that night?

A.   Black hoodie, his hood up, hood on, hands in his pockets.

Q.   Were they in his pants pocket?

A.   Hoodie pocket. [] My son was like, "Nigga, what's up? You wanna fight? What's up? His words was, --

Q.   When you say, "his words," who are you talking about?

A.   The defendant. His words was, "I don't fight. I sling iron." I told my son, I'm like, "Hold up, wait." I'm like, "So you not man enough to put the [gun] down and fight him like a man?" I'm like -- The way I was raised, if you want to fight, we gonna fight.

  But a gun is different. So it kind of aggravated me that he would rather fight -- he would rather shoot my son than stand up like a man and fight him.

Q.   Before we get to that part, where were y'all standing at?

A.   In distance, from here to right their [sic]. (indicating)

Q.   So about 30 to 40 feet?

A.   Yes, sir.

Q.   So you remember that area -- Do you remember any type of dumpsters?

A.  I parked close to the dumpster, which was the opposite side of the road. We were never in close proximity of each other. I was not close to him. He was not close to my son. It wasn't like we were close, never close.

Q.  So you were at one dumpster?

A.  I'm behind, standing behind a white or gray Dodge. We were standing next to that. He's on the opposite side of the complex.

Q.  When you are talking about "Him," you are talking about the defendant?

A.  The defendant. We were never close. It was like the road, it was a good piece of street between us. My son was riled up. I was riled up. He never put the gun down.

Q.  Did you see the defendant have a gun?

A.  Not at that moment. It was a couple of seconds later. His girlfriend came outside.

Q.  Who is the girlfriend?

A.  Laureniana.

Q.  KJ's girlfriend?

A.  Yes, KJ's girlfriend, Laureniana. She came downstairs and everything went to disaster.

Q.  So what happened after she came downstairs?

A.  She tried to fend KJ off. "Chill out. Chill out." I'm talking. They are talking.

Q.  When you say "they are talking," --

A.  Like, she is trying to calm him down. Then he gets frustrated.

Q.  Who gets frustrated?

A.  KJ. He tries to go towards the defendant, but I grabbed him. When I grabbed him and pulled him back, the defendant said, "Oh, fuck that." He pulled his gun out. He cocked it. I said, "Run. Son, run." They took off.

Q.  Who is "they"?

7

A. Laureniana and KJ, they ran. I tried to run and hid in the back of a truck. I kind of stumbled back and went to run again. When I started to run again, that is when the shots started. Bang.

Q. Where were you when the shots started?

A. I was maybe midway to the apartment.

Q. Did you go through the breezeway, or did you go around?

A. I went around. When I got to the front of the truck, I made a right. I ran around the building. I came around and the shots continued. They continued, they continued, they continued, and they continued. When I got to the opening of the stairwell, I froze. I froze. I saw my son laying out, and there were a lot of screaming. He takes off running.

Q. Who took off running?

A. Taveon, the defendant, he took off running. I hollered, and hollered. I went to help Laureniana.

Mr. Flugence testified that the victim did not have a gun on him that night nor did he carry a gun on him as "[h]e was not raised like that." Mr. Flugence admitted to his own criminal history, primarily for drug offenses for which he did time in prison. When repeatedly asked if he had a gun on him, he emphatically stated that he did not:

Q. Did anyone standing next to you say "I have a gun" to the defendant?

A. Right, I never had a gun.

Q. How do we know that?

A. This would be totally different.

Q. In what way?

A. I would be there.

Q. What do you mean by, you would be there?

A. It would not have gone to that extent. Once I heard he had a gun, if I had a gun, I would have shot him.

8

Q.    You would have shot him if he would have had a gun?

A.    Yes.

Q.    Well, what did you do instead?

A.    I tried to -- I wanted him to fight my son. I wanted him to fight my son. My flaw will always be that I did not protect my child properly. I did not defuse the situation. I did not stop and say, "Son, let's go." Instead, he popped the gun out and ran my son down like a dog.

On cross examination, Mr. Flugence stated that his son and Defendant never fought physically, and that there was only a verbal altercation at best. When asked on redirect examination if his son ever touched Defendant before he was murdered, he responded, "No, no, no." He said that he and his son were never within striking distance of Defendant when he pulled his gun, "racked it back[]" and "[s]tarting firing." He stated that when Defendant started firing, his son tried to turn and run away. He stated that when he saw his son's body afterwards, he was shot "[i]n his back."

Marcus Sensley, a contractor working at the apartment complex, testified that he had finished his work and was barbecuing at the time of the shooting and that he observed the events that transpired. He stated that Defendant and the victim initially argued but that the situation had been defused until Mr. Flugence arrived. He said that the victim and Mr. Flugence were "being aggressive swinging their arms, and basically adding fuel to the fire as if they were going to do something to Taveon." Mr. Sensley testified that the victim had advanced to within approximately five feet of Defendant, when "the gun was pulled out, it was automatically shots were fired[,]" and the victim "began to stumble back to lose his balance" before "he hit the ground." He continued:

9

A.    Once he hit the ground, he began to almost like stop, drop, and roll. At that point, Mr. Taveon began to walk up on him and continued shooting.

Q.    So when you say, "walk up to shoot," so while KJ was on the ground, he walked towards him and started shooting at him on the ground?

A.    Correct.

Q.    What did KJ do while that was going on?

A.    He began to keep rolling. Let's say he dropped maybe about five feet from the white truck. He began to roll towards the sidewalk. As he was being shot, he just kept rolling and just trying to get away.

Mr. Sensley stated that when the victim fell to the ground, Defendant walked up to the him and started shooting him "at point blank range, maybe about a foot or two feet." He stated that Defendant kept firing until he emptied his gun's clip, after which he continued pulling the trigger, causing the gun to click. He testified that Defendant then left the scene. He stated that other than Defendant's gun, there were no other guns at the scene.

Steven Glass, who was working at the apartment complex, testified that he saw something he had never seen before during the offense: "An individual shoot another human being, and then walk up and empty a magazine." He stated:

I had my back to what was going on over there, but I had been hearing arguing. I had stopped and was coming back towards the grill. It was a Sunday after noon [sic]. I heard two shots. I got down behind a vehicle. As soon as I heard the two shots, I got down, and then I looked up to see what was going on. I seen somebody walk three or four steps and hold the gun down and discharge it until it clicked.

Officer Clayton Green, of the Lafayette Police Department (LPD), testified that he responded to the scene only a few minutes after the shooting. He found the victim on a stairwell and immediately attempted to render aid. The victim had suffered multiple gunshot wounds. He administered CPR for about five to ten

10

minutes before ambulance personnel arrived. The victim was transported to the hospital where he was pronounced dead.

Dr. Christopher Tape, an expert forensic pathologist, performed an autopsy on the victim. He testified that the cause of death was multiple gunshot wounds to the body and upper extremities. Two of the entry wounds were to the victim's back, both penetrating his heart and lungs. One of these shots caused a bullet to lodge in the victim's sternum, which he removed as evidence. As to the other gunshot wounds, he said that there were too many to accurately assess, other than a bullet wound to the hand/finger and another grazing-type gunshot wound. He stated that the other wounds were clustered closely together, making it difficult to count the number of wounds.

Sargeant Larry Theriot, with the LPD, testified that he arrived after the shooting and videoed and photographed the crime scene. He identified fourteen spent cartridge cases recovered from the scene, all of which were of the same caliber and brand, 9 mm Hornady Luger cartridge casings. In addition, he recovered spent bullet fragments from the scene and a spent bullet fragment taken from the victim's body during the autopsy. He testified that no guns were recovered from the crime scene, and the murder weapon itself was never recovered.

Steven Richardson, a forensic chemist with the Acadiana Crime Lab, was accepted as an expert in the field of firearms identification. He identified fourteen spent Hornady 9 mm Luger cartridge cases that were recovered from the scene of the crime. He testified that after analysis, it was his opinion that all of the bullet casings had been fired from the same gun, which was not recovered. He identified a bullet removed from the victim's sternum and testified that he was able to identify

11

it as being consistent with a 9 mm Luger bullet that was shot from a semi-automatic weapon as opposed to a revolver.

Officer Marion Borel, of the LPD, testified that he was the lead detective on the case. He stated that he interviewed Defendant on April 12, 2019, after he was brought to LPD by two Baton Rouge attorneys. He summarized the interview as follows:

> I learned -- Well, after putting him in and advising him of his Miranda rights, I learned from Mr. Leary that he and -- pretty much he, and I'm gonna keep calling him KJ just to keep it short. They were just beefing with each other, arguing with each other. They had argued apparently several times throughout the week with each other. He just like -- I still to this day couldn't figure out why they were even beefing with each other. He said he was at the complex and he went to the back to visit some old dudes, or something like that. And then KJ had pulled up with his girlfriend. KJ started talking smack to him going back and forth with each other. He said it his unc [sic] was there with him. His unc [sic] had left to go do laundry, or something like that, I believe. And KJ had made a phone call to call to get some people to come over there. And a little bit later at some point he calls his unc [sic] to come back to him from the laundromat. A vehicle rolled up. Three dudes got out of the vehicle. All of them had guns. And he said that the three individuals kind of -- kind of had him boxed in, and he was with his unc [sic]. Somebody shot. He didn't know who shot, so he kind of moved his unc [sic] out of the way and he shot. I asked him if the guy that he was beefing with was the one that shot, and he said yes. And then later on, I asked him if the guy that he was beefing with had shot, and he said "I don't know. I just shot who was in front of me." [2]

Officer Borel was asked if the crime scene and the evidence collected supported Defendant's contention of self-defense:[3]

> Q.  At this point, Taveon Leary claiming self defense [sic]?
>
> A.  Yes, sir.

---

[2] Detective Borel admitted that "unc," who was later identified as Christopher McCree, did not come to LPD to give a statement. However, he testified that this would not have changed his opinion that Defendant did not kill in self-defense, given that there were no other reports of any other guns and all the shots fired were from the same weapon.

[3] There was no objection to this line of questioning.

12

Q. So the question becomes is that why would you just go ahead and arrest him for second degree murder?

A. Because based on the eyewitness testimonies or eyewitness statements, the photograph picking a lineup and no one that I had at the time of the witnesses could even confirm that the victim, KJ, ever had a weapon. He shot an unarmed man, and not only shot him, he made sure he finished the job.

Q. Did of [sic] Mr. Leary's statement match up to the evidence that was collected?

A. No, sir.

Q. Some of the allegations that Mr. Leary stated, were they ever -- Did you -- Were you or anybody at Lafayette Police Department able to corroborate the statement of somebody else shot first?

A. No, sir.

Q. Were you able to corroborate there were three people cornering him?

A. No, sir.

Q. You ever corroborate any part of the story?

A. No, sir.

After the State rested its case, Defendant called his uncle, Christopher McCree, as a witness. He testified that he had grabbed Defendant and was telling him to leave when he heard a shot fired from behind him, from the direction of the victim. He stated that he was pushed out of the way by Defendant, and as he ran off, he heard several more shots. He said that he left the premises and did not return. He stated that he heard the victim threaten Defendant earlier that day, then again immediately before the shooting incident. He stated that he also saw an "imprint" of a gun in the victim's pants earlier that the day. Mr. McCree admitted that he never called the police about what he saw and that he did not provide a statement. He stated that he left town after the shooting and that he never checked on his nephew to see

13

if he was all right. He said that he never talked to Defendant after the incident. He did give a statement to someone on behalf of a lawyer for his nephew.

Donald Depass, Sr., a resident of the apartment complex, testified that the victim had started a "conflict" with Defendant during the week leading up to the shooting. The victim told Defendant that he wanted him dead, although the two never got into a physical altercation. He claimed that on the day of the shooting, he saw a gun in the waistband of the victim's shorts, and he heard the victim tell Defendant that he wanted him dead. He further claimed that he saw a "flame" coming from the victim's hand when the first shot was fired. He stated that before he heard the shot, he heard the victim's father telling him, "kill him, son. Kill him."

Defendant testified on his own behalf. He noted that at five and a half feet tall and 145 pounds, he is not a large man. He stated that on the Monday before the incident, he was outside talking to some older gentlemen, when the victim and his girlfriend drove up and then proceeded upstairs to their apartment. He said that the victim noticed him and began accusing him of being a "rat," i.e., an informant. The two men bickered, but the victim's girlfriend managed to convince him to go inside their apartment.

Defendant testified that he did not see the victim again until Saturday. Defendant was again outside talking to some older men when the victim drove up. According to Defendant, the victim got out his car and then returned to it to retrieve a firearm. The victim then told Defendant: "We are going to get this business clear. We going [sic] to get you." Defendant testified to a similar exchange on Sunday evening, when the victim once again threatened him. Defendant's uncle tried to mediate the situation, but the victim showed that he had a gun and stated, "Back up. I got iron." According to Defendant, he heard the victim call somebody and say,

14

"Pull up right now. We will do this right now." He said that Ms. Thomas came outside and managed to get the victim into their apartment.

According to Defendant, the victim came back outside after a car pulled up and three men armed with guns exited the car. He said that only the victim's father, Mr. Flugence, advanced toward him. Mr. Flugence took off his shirt, told the victim to knock out Defendant, and stated they would kill him after he was knocked out.

Defendant testified that he was scared, and he called for his uncle, who ran over from the laundromat, got in between the would-be combatants, and talked to the victim's father. Defendant's uncle then walked back to him, grabbed him, and told him to leave. Defendant did not leave, as he felt "cornered." He further testified that at that point, the victim charged him, pulled a gun, and fired a shot. Defendant returned fire. The victim began to run while turning and continuing to fire. Defendant advanced as he fired, and the victim fell down "after a couple of shots." Defendant got within a few feet of the victim and kept firing because the victim was still holding his gun. He denied standing over the victim as he shot him. However, on cross-examination, he acknowledged standing four feet from the fallen victim and shooting him "at least eight times[.]" He also acknowledged pursuing the victim as he ran.

We find that all of the elements of second degree murder were proven beyond a reasonable doubt, as concluded by the jury. Contrary to Defendant's version of the events, and as corroborated by the overwhelming physical evidence, the victim was unarmed when he was shot, and the jury obviously concluded that no other weapons were used to threaten Defendant before the shooting. After Defendant pulled his gun, the victim pushed his girlfriend out of the way and began to turn and run. No other shell casings were located at the scene of the murder, other than the fourteen 9 mm Luger rounds all fired from the murder weapon. No weapons whatsoever were

15

located at the scene. The victim's father testified that had he had a gun, he would have shot Defendant. The victim was shot multiple times, with at least two fatal shots fired into his back. After the victim fell to the ground, Defendant stood over him and emptied the magazine of his weapon into the victim. Even then, he continued pulling the trigger several more times.

The record supports the finding that Defendant fired multiple gunshots at an unarmed man. As this court has explained:

> Defendant does not deny that he shot and killed the victim, nor did he deny it at trial. Rather, he argues that the State failed to disprove that he acted in self-defense. . . .
>
> Defendant contends that the killing was justifiable because he had his back against the wall, and was surrounded by the victim and the victim's two friends, Doucet and Jones. Further, he contends that shooting the victim was the only way he could escape.
>
> The Defendant's claim that Jones had a firearm was disputed by both Doucet and Jones at trial. The evidence given by his own mother defeats his claim of justifiable self-defense. The essence of his defense is that he was justified in responding to an attempted punch by shooting his opponent in the chest at close range. We recognize that Dejean had two friends with him. Thus, Defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable. However, the level of force he used to defend himself was far beyond what was necessary under the circumstances.

*State v. Mincey*, 08-1315, pp. 2–3 (La.App. 3 Cir. 6/3/09), 14 So.3d 613, 615.

"It is well-settled that a jury is free to believe some, none, or all of any witness's testimony." *State v. Perkins*, 11-955, p. 10 (La.App. 3 Cir. 3/7/12), 85 So.3d 810, 817. Thus, the jury was free to believe that the victim and his father, while aggressive, were unarmed. As Mr. Flugence suggested in his testimony, it would be logical to believe had he been armed, he would have tried to protect his son by shooting Defendant. Other ancillary matters, such as whether Mr. Flugence

16

arrived at the scene alone or accompanied, were also firmly within the jury's purview regarding witness credibility and weight of evidence.

The testimony of the State's witnesses, the pattern of the shell casings, the medical testimony regarding the victim's back wounds, and Defendant's own admissions that he pursued the victim and fired multiple shots into his prone body from close range, all support the conviction for second degree murder. The jury could have rationally determined, based on the testimony of the State's witnesses, that the victim was unarmed; also, it could have rationally determined that the force used by Defendant was disproportionate, even if he were subjectively scared or had initially felt threatened. The victim was wounded and lying on the ground, and Defendant was able to advance to within four feet of him or closer as he emptied his gun's clip into him. Whatever threat the victim might have posed initially was clearly neutralized.

The jury simply did not believe Defendant's claim nor the testimony of his uncle or Mr. Depass that anyone else was armed. Given the physical evidence, their testimony that the victim had a gun and fired it at Defendant was simply not given any credit by the jury. They did not believe there was any justification for self-defense as it was not consistent with the scene of the crime. Accordingly, we affirm the jury's verdict finding Defendant guilty of second degree murder.

*Second Degree Murder versus Manslaughter*

Having found all the elements of second degree murder present, we find no merit in Defendant's alternate claim that the evidence only supports a manslaughter verdict.

> Louisiana Revised Statute 14:31(A)(1) defines manslaughter as a homicide which would be either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood

17

immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the factfinder finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. **State v. Corkern**, 2003-1393 (La. App. 1st Cir. 9/17/04), 897 So.2d 57, 62, <u>writ denied</u>, 2004-2627 (La. 2/18/05), 896 So.2d 29. Manslaughter requires the presence of specific intent to kill or inflict great bodily harm. **State v. Hilburn**, 512 So.2d 497, 504 (La. App. 1st Cir.), <u>writ denied</u>, 515 So.2d 444 (La. 1987).

*State v. Mellion*, 21-1116, p. 4 (La.App. 1 Cir. 4/8/22), 342 So.3d 41, 45, *writ denied*, 22-732 (La. 6/22/22), 339 So.3d 1186, *cert. denied*, __ U.S. __, 143 S.Ct. 319 (2022).

Thus, the presence of "sudden passion" or "heat of blood" distinguishes manslaughter from murder. The court has stated on several occasions, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. *State v. Tompkins*, 403 So.2d 644 (La.1981); *State v. Temple*, 394 So.2d 259 (La.1981); *State v. Peterson*, 290 So.2d 307 (La.1974). Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Where such proof has been introduced, a second degree murder verdict is inappropriate.

Defendant contends that he met this burden—that he proved the presence of the mitigatory factors by a preponderance of the evidence. In reviewing defendant's claim, this court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Bryan*, 454 So.2d 1297 (La.App.3d Cir.), *cert. denied*, 458 So.2d 128 (1984); *see also Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Moore v. Duckworth*, 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979); *State v. Roy*, 395 So.2d 664 (La.1981).

*State v. Lombard*, 486 So.2d 106, 110–11 (La.1986) (footnotes omitted).

As reflected, it is the Defendant's burden to establish by a preponderance of the evidence that the homicide was a manslaughter rather than second degree murder. Defendant does not deny that he killed the victim but argues that he should

have been found guilty of only manslaughter as the killing was committed in heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. However, the jury heard the evidence including that Defendant continuously shot the victim multiple times, at least twice in the back, while he attempted to flee, and it rejected his version of the shooting.

As Ms. Thomas testified, the victim "pulled down his shorts[]" showing Defendant that "he did not have any guns on him." She went on to state that "[o]nce [the victim] pulled down his shorts, Taveon broke loose from whoever was holding him and basically chased him down." The evidence shows that Defendant began firing his weapon as he approached and then stood over the victim, firing a total of fourteen shots. After the victim fell wounded to the ground, Defendant continued firing until he emptied his gun of bullets.

The testimony at trial from the various witnesses sets forth two competing versions of the relevant events. Stated broadly, the State's witnesses recounted a scenario in which the victim and his father were aggressive but sought a fistfight, not a shootout. None of the State's witnesses who were present during the incident were armed according to their testimony, and the physical evidence from the scene corroborates that testimony. Defendant and his witnesses recalled a scene in which the victim and possibly his father and others were armed; further, in Defendant's version, the victim fired the first shot. The jury obviously did not believe Defendant's version that the victim or anyone else with him was armed when rejecting the self-defense claim. The same jury could logically have determined that the threats of two unarmed men against the armed Defendant were not sufficient to evoke more than normal fear or anger. Thus, the jury found that the mitigatory factors were not established by a preponderance of the evidence. Viewing the

19

evidence in the light most favorable to the prosecution, as we must, we agree with the jury.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find two errors patent and, in addition, that the minutes of sentencing need correction.

First, the trial court sentenced Defendant on June 12, 2023, the same day it denied his motion for new trial and motion for post-verdict judgment of acquittal. At the beginning of the sentencing hearing, defense counsel informed the trial court that he had filed a motion for a new trial. The trial court responded, "Denied, denied." The written motions contain a written denial dated the same day as sentencing. Defense counsel noted that Defendant had not been transported, and the trial court stated that Defendant would need to be present for sentencing. When Defendant arrived,[4] the trial court stated, "Let's proceed on the sentencing of Mr. Larry [sic]." Defense counsel responded:

> Good morning, Your Honor. This is Richie Houghton from the Indigent Defender's Office representing the Defendant, Taveon Larry [sic]. I'm not sure exactly how the Court would like to proceed, but if the Court would recall about one month ago, the State had presented some testimony from the victim's family. The defense reserved the ability to call its own folks to testify. I can make a brief argument, but I have reviewed the PSI, pre-sentence investigation report and ready [sic] to proceed.

---

[4] The transcript does not note when Defendant arrived but does reflect that he testified at the sentencing hearing. The minutes state that Defendant was not present for the beginning of the hearing but arrived prior to the testimony of the defense witnesses, prior to the arguments of counsel, and prior to the imposition of sentence.

Members of Defendant's family testified, the attorneys presented argument, and the trial court presented reasons before imposing the mandatory sentence of life imprisonment at hard labor.

Louisiana Code of Criminal Procedure Article 873 provides:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

In *State v. Kisack*, 16-797 (La. 10/18/17), 236 So.3d 1201, *cert. denied*, 583 U.S. 1160, 138 S.Ct. 1175 (2018), the supreme court held that the Article 873 waiver must be express, not implicit. Distinguishing between the two types of waivers, the supreme court explained that merely participating in the sentencing hearing would be considered an implicit waiver. *Id.* Although announcing a readiness for sentencing had been considered an implicit waiver by some appellate courts, the supreme court explained that such a waiver should really be considered an express waiver. *Id.* Subsequently, in *State v. Boyd*, 17-1749 (La. 8/31/18), 251 So.3d 407, 408, the supreme court found that an express waiver was made when the defense responded that it had no objection to proceeding with sentencing.

While we conclude that defense counsel's statement that "he was ready to proceed" may be considered an express waiver, the supreme court in *Kisack* made it clear that an Article 873 violation may still be considered harmless in situations such as this one. This court recently stated the following about the harmless-error analysis after *Kisack*:

> Prior to the supreme court's ruling in *Kisack*, "errors in failing to observe La.Code Crim.P. art. 873's mandatory sentencing delay were found harmless where a mandatory life sentence was imposed or when the defendant did not challenge his sentence on appeal and did not claim

21

prejudice due to the lack of the delay." *State v. Holden*, 19-867, p. 8 (La.App. 3 Cir. 7/15/20), 304 So.3d 520, 525, *writ denied*, 20-1016 (La. 2/9/21), 310 So.3d 174. Since *Kisack*, courts have continued to find harmless error where a mandatory life sentence is imposed or when the defendant does not challenge his sentence on appeal and does not claim prejudice due to the lack of the delay. *See State v. Deville*, 22-317 (La.App. 3 Cir. 10/19/22), 349 So.3d 1158; *State v. Williams*, 20-605 (La.App. 3 Cir. 11/3/21), 329 So.3d 938, *writ denied*, 21-1798 (La. 4/12/22), 336 So.3d 85; and *State v. Chester*, 19-363 (La.App. 5 Cir. 2/3/21), 314 So.3d 914, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321. In the present case, Defendant neither challenges the sentences imposed nor claims he was prejudiced by the lack of a delay. Thus, we conclude the error to be harmless under these circumstances.

*State v. Toby*, 22-386, pp. 24–25 (La.App. 3 Cir. 3/8/23), 358 So.3d 289, 304, *writ denied*, 23-491 (La. 12/5/23), 373 So.3d 714.

In the present case, a mandatory life sentence was imposed, and Defendant does not challenge his sentence on appeal. Thus, the trial court's failure to abide by the Article 873 delay was harmless.

Second, we find that the trial court failed to advise Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Accordingly, we order the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that he received the notice. *State v. Viltz*, 18-184 (La.App. 3 Cir. 11/28/18), 261 So.3d 847.

Finally, the minutes of sentencing need correction. Although the sentencing transcript indicates that the trial court imposed Defendant's sentence at hard labor, the minutes of sentencing do not state such. In the event of a conflict, the sentencing transcript prevails. *State v. Williams*, 15-498 (La.App. 3 Cir. 12/9/15), 181 So.3d

857, *writ denied*, 16-26 (La. 1/13/17), 215 So.3d 242.[5] Accordingly, we direct the trial court to order the amendment of the minutes of court to reflect that Defendant's sentence was imposed at hard labor.

## DECREE

Defendant's conviction and sentence are affirmed. The trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. The trial court is further directed to order the amendment of the minutes of court to reflect that the life sentence imposed is to be served at hard labor.

## AFFIRMED AND REMANDED WITH INSTRUCTIONS.

---

[5] We note that the minutes of sentencing indicate that the trial court imposed the sentence without benefit of parole, probation, or suspension of sentence, but the transcript does not indicate such. However, no error patent occurred since the sentence is deemed to contain these restrictions. *See* La.R.S. 15:301.1(A).

23